## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PETER JOHN LINDNER, a minor, by his parents
and next friends,
Peter and Theresa Lindner,
3916 Virgilia Street
Chevy Chase, Maryland 20815,

and

PETER and THERESA LINDNER,
3916 Virgilia Street
Chevy Chase, Maryland 20815,

   Plaintiffs,

   v.           Civil Action No. _____

JERRY D. WEAST (officially as),   Superintendent,
Montgomery County Public Schools,
850 Hungerford Drive,
Rockville, Maryland 20850,

and

MONTGOMERY COUNTY BOARD OF
EDUCATION,
850 Hungerford Drive,
Rockville, Maryland 20850,

   Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1. This is a reimbursement action for costs incurred by plaintiffs Peter and Theresa

Lindner in educating their son Peter John ("PJ") Lindner in a private school for disabled children

after Montgomery County Public Schools ("MCPS" or "the school system") failed to provide PJ

with a free appropriate public education ("FAPE") as required under the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*

## Jurisdiction

2.      This Court has jurisdiction over this matter pursuant to the IDEA, 20 U.S.C.

§§ 1400-1461; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794;  42 U.S.C. §

1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343.  Declaratory relief is authorized by 28

U.S.C. §§ 2201 and 2202.  This court has pendent jurisdiction pursuant to MD. CODE ANN.

EDUC. § 8-401 *et seq.*, (1996).  Plaintiffs have exhausted their administrative remedies and

appeal to this court from a decision of an Administrative Law Judge ("ALJ") of the Maryland

Office of Administrative Hearings, MSDE-MONT-OT-05-45611 (January 30, 2006).

## Parties

3.      Peter John ("PJ") Lindner is a disabled student, eligible to receive special

education and related services, who at all times relevant to this action resided in Montgomery

County, Maryland.  His parents, Peter and Theresa Lindner, bring this action on PJ's behalf and

in their own right.

4.      Jerry D. Weast is the Superintendent of MCPS and, as such, is the public official

charged with the responsibility for ensuring that MCPS complies with federal law as to the

education of disabled children.  He is sued in his official capacity.

5.      The Montgomery County Board of Education is a local educational agency as

defined by 20 U.S.C. § 1401, and, as such, receives financial assistance from the United States

Department of Education.  The Montgomery County Board of Education is responsible for

complying with federal law with respect to the provision of a FAPE to each disabled child in Montgomery County.

## Factual Allegations

6.      PJ is a student with multiple and severe educational disabilities who is entitled to special education and related services under the IDEA.

7.      PJ was born on November 6, 1996.

8.      PJ has progressive myoclonic epilepsy, a severe and fatal disease that causes seizure activity, and deterioration in his motor function, speech, language, behavior, and memory.

9.      The expert medical staff monitoring and treating PJ from the Johns Hopkins Hospital cannot predict with any certainty PJ's life expectancy except to confirm that it will be significantly shorter than average.

10.      There is no known cure or effective treatment for Progressive Myoclonic Epilepsy.

11.      Before PJ's condition began to impact his life and was subsequently diagnosed, he was a normal, bright child for the first five years of his life, albeit with some visual and motor deficits that impeded his information processing.

12.      Before moving to Montgomery County, Maryland, in April of 2004, PJ attended first grade in Bernards Township, New Jersey, where he received special education through an Individualized Education Program ("IEP").

13.      In April 2004, the family relocated to Chevy Chase, Maryland, and enrolled PJ in Montgomery County Public Schools.

14.     For the remainder of the 2003-2004 school year, PJ was provided with intensive special education and related services that he received through home/hospital instruction. At his parents' request, he also attended his neighborhood school, Rosemary Hills Primary School, an hour each day for socialization purposes.

15.     During Summer 2004, PJ received Extended Year Services in the home/hospital instruction model.

16.     Since June 2004, PJ has been treated by, and under the supervision of, Dr. James Rubenstein, a neurologist with the John Freeman Pediatric Epilepsy Center at Johns Hopkins Hospital.

17.     As of June 6, 2005, Dr. Rubenstein wrote that PJ "is impacted throughout his day and night, and certainly in school. His prognosis is not good and it is clear that his significant needs will only increase in the future . . . . We are unable to predict the rate of any regression and it certainly may not follow a steady course."

18.     Dr. Rubenstein also emphasized on June 6, 2005, "What Peter needs, both in his educational placement and in his home setting, is a consistent, intensive and protected environment with full-time services from a variety of professionals. He cannot and will be able to handle mainstream settings at school."

19.     Dr. Rubenstein concluded on June 6, 2005, "It is also vital for Peter's well being that we support his emotional and self concept needs as he battles his disease. He should placed in an educational setting that not only can provide the intensive, integrated services he so clearly requires, but one in which he feels good about himself."

20.     For the 2004-2005 school year, defendants proposed another intensive IEP for PJ, with a combination of home/hospital instruction and a one-to-one aide for his socialization periods at Rosemary Hills, which were increased to 2.5 hours per day.

21.     PJ missed a significant portion of the 2004-2005 school year, when he was too impaired to intend Rosemary Hills.

22.     On September 28, 2004, the Lindners filed an application for PJ to attend the Ivymount School, a Maryland-approved full-time special education placement for significantly disabled children.

23.     The Lindners also asked defendants to recommend other special education alternatives, public or private, for their consideration.

24.     Neither home/hospital instruction, which was terminated in November 2004, nor attendance at Rosemary Hills, proved adequate to address PJ's needs, which included academics, safety, mobility, socialization, speech/language, fatigue, and anxiety/depression.

25.     In April 2005, Ivymount accepted PJ for the 2005-2006 school year.

26.     In May 2005, Mr. Lindner attended an IEP meeting with defendants at Rosemary Hills, where he advised school staff that PJ had been accepted by Ivymount for the coming year.

27.     In June 2005, defendants convened another IEP meeting at which defendants requested extensive new evaluations.

28.     The Lindners at first authorized the requested evaluations, with reservations, but then withdrew their authorization based on Dr. Rubenstein's considered and strongly-worded opinion that such additional evaluations would be unnecessary and cruel to PJ, given his

5

deteriorating condition.  Dr. Rubenstein offered to discuss this matter with defendants, but no school staff ever made any response to that offer.

29.     The Lindners encouraged defendants to conduct whatever evaluations, reviews or observations could be accomplished without direct contact with PJ, and did respond to defendants' psychologist when provided with behavior checklists.

30.     Defendants did conduct and complete a psychological evaluation, which was presented to the Lindners at an IEP meeting on August 30, 2005.

31.     On August 29, 2005, the Lindners began PJ at Ivymount, with a full-day of special education, integrated related services, a one-to-one aide, and onsite nursing services.

32.     On August 30, 2005, defendants convened an IEP meeting and completed PJ's proposed IEP for the 2005-2006 school year.

33.     The proposed 2005-2006 IEP called for PJ to receive special education and related services for 83% of the school day, and a one-to-one aide 100% of the time.  It proposed including PJ with the general education population only during lunch and recess and did not provide for nursing services.

34.     At the IEP meeting on August 30, 2005, defendants rejected the Lindners' request for placement of PJ at Ivymount, but instead proposed to place him in the program for Orthopedically Impaired students at Forest Knolls Elementary School.

35.     PJ is not, and never has been, Orthopedically Impaired.

36.     No representative from the proposed program attended the IEP meeting on August 30, 2005, and school system representatives at the meeting could answer virtually no questions as to the specifics of the program.

37.    The Lindners served notice at the conclusion of the August 30, 2005· IEP meeting that they were rejecting the proposed placement and continued to request that defendants place and fund PJ at Ivymount.  However, at that time they also agreed to go and observe at Forest Knolls.

38.    On September 12, 2005, the Lindners filed a request for a Due Process Hearing under the IDEA, contesting the proposed IEP and placement at Forest Knolls, and requesting funding and placement for PJ at Ivymount.

39.    As discussed at the August 30, 2005, IEP meeting, the Lindners requested an observation in the Orthopedically Impaired program at Forest Knolls, but defendants refused to allow them to observe.

40.    Defendants also refused to permit Michelle Davis, an independent special education expert hired by the Lindners, to observe at Forest Knolls.

41.    When challenged on their denial for a parent observation at Forest Knolls, defendants responded that they would allow such observations if the parents and Ms. Davis agreed to not talk about anything they saw at the school in any subsequent Due Process Hearing.

42.    Because they were not allowed to observe and testify about the proposed program at Forest Knolls, the parents compelled the attendance of the director of that program, Kathryn Davis, as the first witness at the Due Process Hearing which began on October 27, 2005.

43.    At the Due Process Hearing and under oath, the Director of the Forest Knolls program, testified that her program was not appropriate for any student who was not Orthopedically Impaired, and further testified that there was no way that she could implement PJ's IEP at Forest Knolls.

44.     The second witness at the Due Process Hearing, one of defendants' special education supervisors, Patrick Devine, also testified under a subpoena requested by the Lindners.

45.     Mr. Devine, who had participated in PJ's IEP meeting on August 30, 2005, also acknowledged under oath that the proposed IEP could not be implemented at Forest Knolls based the testimony of Kathryn Davis.

46.     The Due Process Hearing lasted eight days and was not completed until January 17, 2006.

47.     During the Due Process Hearing, the ALJ heard testimony in the Lindners' case as to the nature and severity of PJ's disability, the parents' and their experts' concerns about the proposed IEP and placement at Forest Knolls, and the benefit PJ was receiving from his placement at Ivymount.

48.     During the Due Process Hearing, the ALJ heard testimony in defendants' case from MCPS staff, who contradicted Kathryn Davis and Mr. Devine in concluding that the proposed IEP could be appropriately implemented at Forest Knolls in the special education inclusion model.

49.     At the conclusion of the Hearing, over two-and-a-half months after she first testified, defendants placed Kathryn Davis back on the witness stand.  She contradicted her earlier testimony by stating that she had decided during the course of the hearing that she could implement PJ's proposed IEP in the Orthopedically Impaired placement at Forest Knolls.

50.     Kathryn Davis's explanation of how she could implement PJ's IEP at Forest Knolls was contradictory to the manner in which other witnesses called by defendants suggested that the IEP could be implemented.

51.     When asked why she had changed her opinion during the months of the hearing, Kathryn Davis testified that she had been "surprised" by the earlier questions on the first day of hearing, even though she acknowledged having considered how to implement PJ's IEP when it was first forwarded to her in September 2005, and even though she had prepared for testifying at the Hearing's first day.

52.     The ALJ heard substantial and convincing evidence at the Due Process Hearing that defendants' IEP was inappropriate and that the placement at Forest Knolls could not meet PJ's needs. The evidence before the ALJ also confirmed that PJ was benefitting from Ivymount.

53.     The Due Process Hearing Decision issued on January 31, 2006, and found that the parents did not meet their burden of proving that MCPS denied PJ a FAPE, or that they were entitled to funding at Ivymount.

54.     The Hearing Decision contains many errors of law and fact, and is incorrect in failing to fund PJ's 2005-2006 school year placement at Ivymount.

55.     The ALJ ignored evidence that the primary witness for MCPS, Kathryn Davis, contradicted herself and other school system witnesses after first admitting that the proposed placement was inappropriate.

56.     The ALJ ignored the significant fact that unlike PJ, all other students in the proposed program at Forest Knolls were able to participate in the general education environment and had needs in the area of Orthopedic Impairment.

57.     The ALJ ignored the opinions of the Lindners' experts, who testified that PJ could not be appropriate placed at Forest Knolls and that he required placement at Ivymount.

58.     The ALJ ignored the fact that no witness from MCPS ever explained why it was appropriate to place a deteriorating, neurologically disabled child in a school program where he would be unlike every other student in the school building, both as to the environment called for in his IEP and as to his specific needs.

59.     The ALJ ignored the incriminating evidence that the MCPS witness tasked with providing the program proposed for PJ did not suggest how she could provide that program until the middle of the school year, January 17, 2006.

60.     The proposed placement at Forest Knolls could not meet PJ's identified needs.

61.     Forest Knolls was not able to implement PJ's IEP calling for 83% self-contained special education.

62.     Ivymount is a proper placement for PJ, and he has made significant progress there.

63.     Since the final date of the Due Process Hearing, PJ's deterioration has increased at a sporadic pace.

64.     PJ is sometimes unable to attend even Ivymount at this point, and often cannot remember basic information, such as his brother's name, his address, how to swallow, how to walk forward, and how to care for himself. He has more frequently engaged in self-injurious behavior, such as biting and hitting himself, out of frustration.

## COUNT I

65.     Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 64.

66.     Defendants' failure to provide PJ Lindner with a free appropriate public education violates plaintiff's rights under the IDEA, Section 504, Section 1983, and Maryland law.

## COUNT II

67.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 64.

68.    The failure of the ALJ to order defendants to place and fund PJ Lindner in an appropriate program violates the IDEA and Maryland Law.

## COUNT III

69.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 64.

70.    The ALJ Officer committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law by failing to consider relevant, probative and admissible evidence and testimony offered by the parents.

## COUNT IV

71.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 64.

72.    The failure of defendants to provide plaintiffs with adequate due process procedures violates the IDEA, Section 504, Section 1983, and Maryland law.

## COUNT V

73.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 64.

74.    The Hearing Officer committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law, by failing to render a proper decision on all substantive issues presented by the plaintiffs.

WHEREFORE, plaintiffs respectfully request that this Court:

1.    Issue judgment for plaintiffs and against defendants;

2.    Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;

3.    Issue injunctive relief ordering defendants to reimburse plaintiffs for the tuition expenses and costs incurred in enrolling PJ Lindner at the Ivymount School for the 2005-2006 school year, while declaring Ivymount to be PJ's current educational placement under the IDEA;

4.    Order defendants to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

5.    Award any other relief that this Court deems just.

Respectfully Submitted,

Michael J. Eig          #07718

Haylie M. Iseman          #14782
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Plaintiffs

12