IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PETER JOHN LINDNER, et al.                :

                                          :

      v.                                  : Civil Action No. DKC 2006-0476

                                          :

JERRY D. WEAST, et al.                    :

                                          :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case brought under the Individuals with Disabilities Education Act are (1) the motion of Plaintiffs Peter John Lindner, Peter Lindner, and Theresa Lindner for summary judgment (paper 8); and (2) the cross-motion of Defendants Jerry D. Weast and the Board of Education of Montgomery County for summary judgment (paper 12). The issues are briefed fully and the court has reviewed the administrative record in its entirety. The court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court denies Plaintiffs' motion for summary judgment, and grants Defendants' cross-motion for summary judgment.

**I.   The Individuals with Disabilities Education Act**

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and accompanying regulations, 34 C.F.R. § 300 et seq., require all states that receive federal funds for education to provide each child between the ages of three and twenty-one, who has a disability, with a free and appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). Maryland's regulations governing the provision of a FAPE to children with

disabilities in accordance with the IDEA are found at Md. Code Regs. 13A.05.01.

The FAPE guaranteed by the IDEA must provide a disabled child with meaningful access to the educational process. *See Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 192 (1982). The FAPE must be reasonably calculated to confer "some educational benefit" on the disabled child. *Id.* at 207. The benefit must also be provided in the least restrictive environment appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550. The IDEA does not require that a school district provide a disabled child with the best possible education, *Rowley,* 458 U.S. at 192, or that the education maximize each child's potential, *see Hartmann v. Loudoun County Bd. of Educ.,* 118 F.3d 996, 1001 (4th Cir. 1997), *cert. denied,* 522 U.S. 1046 (1998). The benefit conferred, however, must amount to more than trivial progress. *See Reusch v. Fountain,* 872 F. Supp. 1421, 1425 (D.Md. 1994) (*Rowley's* "'some educational benefit' prong will not be met by the provision of de minimis, trivial learning opportunities.") (citing *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir. 1985)).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be disabled. 20 U.S.C. § 1414(d). That IEP is formulated by a team ("IEP Team") consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results of evaluations of

the child, and, when appropriate, the child himself or herself. 20 U.S.C. § 1414(d)(1)(B); Md. Code Regs. 13A.05.01.07(A). The IEP must state the student's current educational status, annual goals for the student's education, the special educational services and other aids that will be provided to the child to meet those goals, and the extent to which the child will be "mainstreamed," i.e., spend time in regular school environments with non-disabled students. 20 U.S.C. § 1414(d)(1)(A).

The IDEA provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions." *MM ex rel. DM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 527 (4th Cir. 2002) (internal quotation marks and citation omitted); *see also* 20 U.S.C. § 1415. Among those safeguards, a parent must be provided prior written notice of a decision to propose or change the educational placement of a student. Md. Code Regs. 13A.05.01.13(B). A parent may also request a meeting at any time to review and, as appropriate, revise the student's IEP. Md. Code Regs. 13A.05.01.08(B)(3).

If the parents are not satisfied with the IEP, they may present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After such a complaint has been received, the parents also are entitled to request a due process hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(f). In Maryland, the Maryland Office of Administrative Hearings conducts the due process hearing. Md. Code Ann., Educ. § 8-413; Md. Code

Regs. 13A.05.01.15(C)(1).    Any party can then appeal the administrative ruling to federal or state court. Md. Code Ann., Educ. §  8-413(h).

When a FAPE is not provided to a disabled student, the student's parent may place the child in a private school and then seek tuition reimbursement from the state.  *See Sch. Comm. of Burlington v. Dep't of Ed.,* 471 U.S. 359, 369-70 (1985).   The parent will recover if (1) the placement proposed by the state was inadequate to offer the child a FAPE, and (2) the private education services obtained by the parents were appropriate to the child's needs.  *Id.* at 370.

## II.  Background

The facts presented are derived from the administrative record of the due process hearing, including the transcript and admitted exhibits, and are uncontested unless otherwise noted.  Peter John Lindner ("PJ") was born on November 6, 1996.  PJ has progressive myoclonic epilepsy, a serious neurological condition that causes seizure activity and deterioration of the child's motor function, speech, language, behavior, and memory.

At the beginning of the 2003-2004 school year, PJ was enrolled in first grade in the Bernards Township Public Schools in New Jersey.  He was found eligible for special education and was given an IEP providing a combination of home and classroom instruction. In April 2004, PJ's family moved to Montgomery County, Maryland, and the child was enrolled with Montgomery County Public Schools ("MCPS").   PJ again was found eligible for special education services and was given an IEP for 27 hours/week special education

4

instruction, speech and language services, occupational and physical therapy, school health services, and a vision consultation. The services were provided through home instruction, but, at his parents' request, PJ also attended class for one hour a day at Rosemary Hills Primary School ("Rosemary Hills"), for socialization purposes. While at Rosemary Hills, PJ was provided with a one-on-one aide.

In summer 2004, PJ received Extended School Year services ("ESY" services) through home instruction. On September 2, 2004, an IEP was completed for PJ's second grade year. The IEP continued the special education instruction for 27 hours/week, speech and language services, occupational and physical therapy, school health services, and the vision consultation. The services continued to be provided through home instruction. PJ's attendance at Rosemary Hills for socialization purposes was increased to 2.5 hours a day, again with the help of a one-on-one aide.

On September 28, 2004, PJ's parents submitted an application for admission to a private special education school, the Ivymount School ("Ivymount"). In November 2004, at the parents' request, MCPS cancelled home instruction services.[1] PJ continued to attend Rosemary Hills every day from 9:00 a.m. until 11:40 a.m., with the one-on-one aide, for the remainder of the 2004-2005 school year. His related services were provided at Rosemary Hills. During this

---

[1] Although it is not entirely clear, the Lindners apparently cancelled home instruction because PJ's condition was worsening. (Paper 7, Tr. at 510-12; MCPS ex. 67). Nevertheless, PJ continued to attend Rosemary Hills for 2.5 hours a day.

time, PJ received 45 minutes of occupational therapy, twice a week, from Megan Boyle.  He received 45 minutes of special education in a class with two other children, four times a week, from Paula Seifert.  PJ also attended a second grade class taught by C. Kevin Kentfield.  While attending Rosemary Hills, at the request of his parents, PJ was not subjected to the same academic pressures as the other children in his classes, however he received instruction from Ms. Seifert and Mr. Kentfield in reading, writing, math, social studies, science, and other classroom subjects.  PJ was given the use of assistive technology devices to assist him with word find and writing.

On April 18, 2005, PJ's parents were notified that Ivymount had accepted PJ for admission in the 2005-2006 school year.  On May 12, 2005, an IEP meeting was held to discuss PJ's third grade education.  Because Rosemary Hills provided education only through the second grade, it was anticipated that PJ would need to change schools for the following year.  During the meeting, counsel for PJ's parents informed MCPS that PJ had been accepted at Ivymount. MCPS proposed goals and objectives and made recommendations for related services, although no IEP was written.  MCPS also recommended that PJ receive three hours of daily ESY services during the summer.  PJ's parents rejected the recommendation.

On June 14, 2005, another IEP meeting was held.  MCPS requested additional evaluations of PJ, including an educational examination, a speech and language examination, an occupational therapy/physical therapy examination, a psychological examination,

a vision examination, and a health assessment.[2]  The team decided
to extend PJ's current IEP, with an interim placement at Chevy
Chase Elementary School, until the evaluations were completed.
Although PJ's parents initially authorized the evaluations, they
later withdrew their consent, with the qualification that MCPS was
free to do "any evaluation that can be achieved without interaction
with PJ."  (Paper 7, Lindner ex. 17).  Following the withdrawal of
consent, Ellen Fulton, a MCPS psychologist, completed a
psychological evaluation based on a review of records and with
written input from PJ's parents and MCPS staff.

On August 29, 2005, PJ began attending Ivymount, where he was
provided with a full day of special education services.  On August
30, 2005, an IEP meeting was held.  At the meeting, PJ's father
told the IEP team that PJ already was attending Ivymount.  MCPS
presented the findings of Ms. Fulton's psychological evaluation.
A proposed IEP was completed, which incorporated goals and
objectives that were developed during the May 12, 2005, meeting.
In the IEP, PJ was coded as having "multiple disabilities" based on
the following categories:   speech/language impairment, visual
impairment, and "other health impairment."   The IEP provided the
following:

> - PJ would receive special education services
> 25 hours a week, including instruction in
> reading, math, science, social studies, and
> "specials"
>
> - The least restrictive environment was
> identified as being outside of the general
> education class more than 60% of the time
> because PJ requires small group instruction

---

[2] The most recent evaluations of PJ were completed in January
2003.

7

for the majority of his school day and because his academic and medical needs require the expertise of a special educator

- PJ would not participate with nondisabled peers in the general education environment 83% of the time

- PJ would participate with nondisabled peers in general school activities and extracurricular activities with "staff/medical support"

- PJ would receive 60 minutes/week of occupational therapy

- PJ would receive 30 minutes a week of physical therapy, with 15 minutes "consult" and 15 minutes "direct"

- PJ would receive vision consultation services

- PJ would receive school health services as provided for in his Individual Health Care Plan

- PJ's placement would be at the Orthopedically Handicapped Program at Forest Knolls Elementary School

(Paper 7, Lindner ex. 99). Moreover, although not written into the IEP, the parties agree that a one-on-one aide was to be provided under the plan.

PJ's parents rejected the August 30, 2005, IEP, asserting that PJ required special education services 100% of the time. On September 12, 2005, the Lindners filed for a due process hearing, alleging that MCPS failed to offer PJ a FAPE, contesting the placement at Forest Knolls, and requesting placement and funding at Ivymount. The due process hearing was held before administrative law judge ("ALJ") Judith Jacobsen. The hearing began on October

27, 2005, and was continued on November 15, 2004, November 21-22, 2005, November 28, 2005, January 9-10, 2006, and January 17, 2006. On January 30, 2006, the ALJ found that MCPS provided PJ with a FAPE and denied the Lindners' request for placement and funding at Ivymount.  (Paper 7, ALJ decision, at 35).

The Lindners appealed to this court on February 23, 2006. Here, the Lindners seek: (1) a declaration that Defendants violated Plaintiffs' rights under the law; (2) injunctive relief ordering Defendants to reimburse Plaintiffs for the tuition expenses for the 2005-2006 school year at Ivymount; (3) a declaration that Ivymount is PJ's current educational placement under the IDEA; (4) attorneys' fees and costs; and (5) any other relief the court deems just.  Plaintiffs filed a motion for summary judgment on May 19, 2006 (paper 8), and Defendants filed a cross-motion for summary judgment on June 26, 2006 (paper 12).  In their cross-motion Defendants seek dismissal of the complaint and such other relief that the court deems just.

**III.  Motions for Summary Judgment**

**A.   Standard of Review**

In *MM*, 303 F.3d 523, the Fourth Circuit stated the standard of review for motions for summary judgment in IDEA cases:

> In a judicial proceeding under the IDEA, a
> reviewing court is obliged to conduct a
> modified *de novo* review, giving "due weight"
> to the underlying administrative proceedings.
> In such a situation, findings of fact made in
> administrative proceedings are considered to
> be prima facie correct, and if a reviewing
> court fails to adhere to them, it is obliged
> to explain why.  The court is not, however, to

> substitute [its] own notions of sound
> educational policy for those of local school
> authorities . . . .

303 F.3d at 530-31 (citations and internal quotation marks
omitted). General standards of review for summary judgment motions
also apply in IDEA cases, as illustrated in *Bd. of Educ. of
Frederick County v. I.S. ex rel. Summers*, 325 F.Supp.2d 565, 578
(D.Md. 2004):

> In addition, the Court's analysis is
> shaped by the mandate of Rule 56(c) of the
> Federal Rules of Civil Procedure that summary
> judgment "shall be rendered forthwith if the
> pleadings, depositions, answers to inter-
> rogatories, and admissions on file, together
> with the affidavits, if any, show that there
> is no genuine issue as to any material fact
> and that the moving party is entitled to a
> judgment as a matter of law."  "When the
> moving party has met its responsibility of
> identifying the basis for its motion, the
> nonmoving party must come forward with
> 'specific facts showing that there is a
> genuine issue for trial.'"  *White v.
> Rockingham Radiologists, Ltd.,* 820 F.2d 98,
> 101 (4th Cir. 1987) (quoting *Celotex Corp. v.
> Catrett,* 477 U.S. 317, 324 (1986); Fed. R.
> Civ. P. 56(e)).  The Court's function is
> limited to determining whether sufficient
> evidence supporting a claimed factual dispute
> exists to warrant resolution of the matter at
> trial.  *Anderson v. Liberty Lobby, Inc.,* 477
> U.S. 242, 249 (1986).  In that context, a
> court is obligated to consider the facts and
> all reasonable inferences in the light most
> favorable to the nonmoving party. *Matsushita
> Elec. Indus. Co. v. Zenith Radio Corp.,* 475
> U.S. 574, 587 (1986). Where, as here, cross-
> motions for summary judgment are filed, a
> court must "evaluate each party's motion on
> its own merits, taking care [in each instance]
> to draw all reasonable inferences against the
> party whose motion is under consideration."
> *Mingus* [*Constructors*]*, Inc. v. United States,*
> 812 F.2d 1387, 1391 (Fed. Cir. 1987).

Plaintiffs in IDEA cases face an uphill battle for several reasons. First, just as Plaintiffs were required to carry the burden of proof in the administrative hearing, *Schaffer ex rel. Schaffer v. Weast*, __ U.S. __, 126 S.Ct. 528, 537 (2005), Plaintiffs also must carry that burden in this court, *I.S.,* 325 F.Supp.2d at 27 ("As the party challenging the administrative findings, Plaintiffs bear the burden of proof of establishing a violation of the IDEA."); *Cavanagh v. Grasmick,* 75 F.Supp.2d 446, 457 (D.Md. 1999)). Second, "[i]f the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Cavanagh*, 75 F.Supp.2d at 457 (citing *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991)). Moreover, in according "due weight" to the findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses. "[T]he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Justin G. ex rel. Gene R. v. Bd. of Educ. of Montgomery County,* 148 F.Supp.2d 576, 588 (D.Md. 2001) (quoting *Bd. of Educ. of Montgomery County v. Hunter ex rel. Hunter,* 84 F.Supp.2d 702, 706 (D.Md. 2000)); *see also Doyle,* 953 F.2d at 104. Lastly, this court owes generous deference (as did the ALJ) to the educators on PJ's IEP Team:

> We have always been, and we should continue to be, reluctant to second-guess professional educators. As we observed in *Tice v. Botetourt County School Board*, 908 F.2d 1200, 1207 (4th Cir. 1990), "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-

> guess the judgment of education
> professionals." Indeed, we should not
> "disturb an IEP simply because we disagree
> with its content," and we are obliged to
> "defer to educators' decisions as long as an
> IEP provided the child the basic floor of
> opportunity that access to special education
> and related services provides. *Id*. (internal
> citation and quotations omitted).

*MM*, 303 F.3d at 532-33.

## B.   Analysis

The key issue in this case is whether MCPS provided PJ with a
FAPE.  To determine whether a disabled student is being provided a
FAPE under the IDEA, courts follow the two-step approach
articulated in *Rowley*.  As explained in *I.S.*, 325 F.Supp.2d at 578:

> First, the Court must determine whether the
> state or local educational authority complied
> with the procedures set forth in the Act.
> [*Rowley*, 458 U.S. at 206.]  Second, the Court
> must determine whether the IEP was reasonably
> calculated to enable the child to receive
> educational benefits.  *Id*. at 207.

## 1.   Procedural Compliance

Plaintiffs argue that PJ was deprived of a FAPE due, in part,
to Defendants' procedural violations under the IDEA.  Plaintiffs
state that at the August 30, 2005, IEP meeting, Mr. Lindner
indicated that he wanted to observe the program at Forest Knolls.[3]

---

[3] In support of this statement, Plaintiffs cite to "MCPS-37."
(Paper 8, at 8).  The "Summary of the Evidence" section of the ALJ
opinion does not list an exhibit 37 from either Defendants or
Plaintiffs, nor can the court find an exhibit 37 in the
administrative record.  Plaintiffs apparently mean to refer to
Lindner Ex. 99, which is the IEP.  It was "MCPS-37" for disclosure.
(Paper 7, Tr. at 40-41.)  There is nothing in the IEP about the
parents' requesting to observe the program, and Mr. Lindner
testified at the hearing that he did not ask to observe the Forest
Knolls program at the August 30, 2005, IEP meeting.  (Paper 7, Tr.
(continued...)

Plaintiffs assert that Defendants committed a procedural violation when they failed to allow the Lindners to observe the proposed placement at Forest Knolls unless the Lindners agreed to withdraw their due process hearing request and agreed not to testify about their observation at a future hearing.  Plaintiffs do not point to a specific provision of the IDEA that allegedly was violated when Defendants prohibited the parents' observation of the program or provide any other legal authority for the proposition.  Instead, Plaintiffs assert generally that the burden of proof is on them to present testimony and evidence to demonstrate that Defendants' placement is inappropriate, and that "the school system does not have the authority to limit what parents can testify about." Plaintiffs conclude: "The school system's practice is a violation of the IDEA, is reprehensible, and should be stopped."  (Paper 8, at 31).

Plaintiffs did not argue before the ALJ that MCPS committed a procedural violation by failing to let the Lindners observe the Forest Knolls program, nor did the ALJ address any alleged procedural violation in her opinion.  Instead, counsel for parents used this factual allegation in the context of arguing before the ALJ that the IEP lacked clarity, (paper 7, Tr. at 1434), and as a defense to Defendants' challenge that PJ's parents failed to act in good faith and cooperate during the IEP process (paper 7, Lindners'

---

[3](...continued)
at 328).  Defendants' position is that Plaintiffs did not ask to observe the Forest Knolls program until after they filed for a due process hearing.

13

written closing argument at 6).[4]   Accordingly, any alleged procedural violation on the part of Defendants is not properly before this court.  Moreover, as counsel for Plaintiffs pointed out at a hearing before Judge Messitte of this district, the IDEA does not provide an absolute parental right to observe a particular program, whether the request is made prior to or after a due process hearing request is made.  (Paper 12, ex. B, at 29).

---

[4] The ALJ found that the IEP was sufficiently clear.  (Paper 7, ALJ decision at 18).  Plaintiffs do not dispute this finding on appeal.

## 2.   Substantive Compliance

In finding that the IEP was reasonably calculated to enable PJ to receive an educational benefit, the ALJ stated:

> I have concluded, after reviewing all the Child's medical, educational, and emotional needs, that the August 30, 2005[,] IEP is reasonably calculated to offer educational benefits to the Child, and that his medical, cognitive, and emotional needs are adequately addressed by the services in the IEP. I find that the IEP, as written, provides the Child with access to a [FAPE].

(Paper 7, ALJ decision at 30). The ALJ also concluded that MCPS would be able to implement the IEP at Forest Knolls. *Id*. at 34. Plaintiffs ask the court to reverse the ALJ decision, arguing that Forest Knolls cannot implement PJ's IEP and that Ivymount is the least restrictive environment and proper placement for PJ.[5]

## a. Deference to the ALJ

At the outset, Plaintiffs assert that the ALJ's decision "is consistently flawed" and that the ALJ erred by ignoring "the overwhelming and one-sided evidence and the weight of the law." (Paper 8, at 3). Due to these errors, Plaintiffs assert that the ALJ's findings were not "regularly made," and therefore deserve no deference. *See Doyle*, 953 F.2d at 105. However, other than Plaintiffs' conclusory assertions, there is no evidence that the ALJ did not make "regular findings."

---

[5] Plaintiffs do not directly challenge the sufficiency of the IEP, but only whether the proposed placement can implement the plan. Plaintiffs do, however, make multiple references to PJ's "deteriorating condition." (Paper 8, at 7, 11). Defendants correctly assert that, to the extent that Plaintiffs argue that a new IEP is appropriate given PJ's changing needs, Plaintiffs have failed to exhaust their administrative remedies and the issue is not properly before this court.

Plaintiffs first assert that the ALJ failed to recognize that Kathryn Davis, the supervisor of the Orthopedically Handicapped Program ("OHP") at Forest Knolls, admitted under oath that the Forest Knolls program could not implement PJ's IEP.  Plaintiffs point out that on the first day of testimony Ms. K. Davis was called by the parents as their witness, and testified that it was "literally impossible for her program to implement PJ's IEP at Forest Knolls."[6]  (Paper 8, at 18).  Plaintiffs additionally argue that the ALJ erroneously gave more weight to Ms. K. Davis's testimony two-and-a-half months after her original testimony, and failed to recognize that her proposal still was insufficient to implement PJ's IEP.

The ALJ did not fail to recognize that Ms. K. Davis initially testified that her program could not implement PJ's IEP.  In her decision, the ALJ cites both the testimony of Ms. K. Davis on the first day of the hearing as well as her later testimony, when she was called as a witness by MCPS.  In describing this later testimony, the ALJ states:

> On January 17, 2006, Ms. K. Davis was called by MCPS as its witness.  She was asked whether the Child's IEP could be implemented as written at the Forest Knolls OHP.  She answered that it could be implemented as written, and offered several different ways in which the implementation could occur, including the use of pull-out special education resource rooms.

(Paper 7, ALJ decision at 33).  The ALJ also pointed out that in both days of testimony, Ms. K. Davis testified that a written

---

[6] Both Kathryn Davis and Michelle Davis testified during the due process hearing.  Accordingly, they will each be referred to by their first initial and last name.

description of the OHP was accurate.  The description contained the
following passage: "[The Forest Knolls OHP offers] inclusive
education settings in order to provide the least restrictive
environment for all students.  The student's IEP dictates [the]
program in which both plug-in and pull-out services are available
in order to accommodate for individual needs."  (Paper 7, ALJ
decision at 33 (citing Lindner ex. 98)).  The ALJ concluded:

> The written description is consistent with Ms.
> K. Davis's testimony that the Child's IEP
> could be accommodated by pull-out services.  I
> find Ms. K. Davis's lengthy testimony on the
> second day she was called to be more
> persuasive evidence than her cursory and
> qualified answer on the first day she was
> called.

(Paper 7, ALJ decision at 33).  The ALJ also commented on the
testimony of Patrick Devine, an MCPS Special Education Cluster
Supervisor called by Plaintiffs as a witness, who testified that,
based on Ms. K. Davis's initial testimony, Forest Knolls could not
implement PJ's IEP.  The ALJ stated: "This testimony is no stronger
than its basis, the one-sentence answer of Ms. K. Davis on October
27, 2005.  Accordingly, I do not accept Mr. Devine's answer as
persuasive evidence that the Child's IEP could not be implemented
at the OHP at Forest Knolls."  (Paper 7, ALJ decision at 34).
Finally, the ALJ discussed the testimony of Michelle Davis,
Plaintiffs' educational consultant, and the testimony of Dr.
Conley, PJ's psychiatrist, and explained why the testimony of those

witnesses failed to show that Forest Knolls could not implement PJ's IEP.[7]

Plaintiffs have not shown that the ALJ's findings were made in an irregular manner.  Instead, Plaintiffs essentially argue that the ALJ should have given more weight to the initial testimony of Ms. K. Davis, while disregarding her later testimony, and that the ALJ was wrong in her conclusion that based on Ms. K. Davis's later testimony, the OHP program at Forest Knolls can implement PJ's IEP. As the Fourth Circuit noted in *Doyle*, 953 F.2d at 104, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also A.B. ex rel. D.B.*, 354 F.3d at 329 (reversing the district court's opinion where the court rejected the hearing officer's decision and noting that the district court wrongly disregarded the officer's resolution of conflicting expert testimony).  The court therefore will consider the ALJ's findings *prima facie* correct.  *Cavanagh*, 75 F.Supp.2d at 457.

---

[7] The ALJ concluded that Ms. M. Davis's testimony that Forest Knolls was a "full inclusion program" was based on a visit to the program four years earlier and did not establish that Forest Knolls could not implement PJ's IEP.  The ALJ also pointed out that Dr. Conley testified that she did not know a lot about Forest Knolls and did not offer an opinion as to whether PJ's IEP could be implemented at the Forest Knolls OHP.  (Paper 7, ALJ decision at 34).

**b.  Appropriateness of Placement at Forest Knolls**

The ALJ determined that the August 30, 2005, IEP offered PJ a FAPE and that the Forest Knolls OHP could implement the IEP.  In support, the ALJ stated: "I find that the person who was most knowledgeable about the OHP, Ms. K. Davis, testified convincingly that MCPS would be able to implement the IEP in the OHP at Forest Knolls.  The judgment of educational professionals is ordinarily entitled to deference."  (Paper 7, ALJ decision at 34).

It is Plaintiffs' burden to establish that the OHP at Forest Knolls cannot implement PJ's IEP.  Plaintiffs first argue that PJ is not categorized as an orthopedically impaired student and therefore that the OHP program is not proper for him because he would be dissimilar from the other students.  As the ALJ pointed out, the IDEA does not require that a child be placed with children who have like disabilities.  (Paper 7, ALJ decision at 32, n.11). Moreover, Plaintiffs concede that although PJ may not be orthopedically impaired, he is not a "physically fully-abled person." (Paper 8, at 17 n.6; paper 7, Tr. at 272).  The August 30, 2005, IEP also supports that PJ has physical disabilities - it provides for physical therapy, a wheelchair, and a one-on-one aide to secure PJ's physical safety while in school, (paper 7, Lindner ex. 99).  Accordingly, even though PJ is not coded as having an orthopedic impairment, he does have physical disabilities like other students in the OHP, and his physical needs can be accommodated at the Forest Knolls OHP.

Plaintiffs next rely on Ms. K. Davis's initial testimony to support their argument that because the Forest Knolls OHP is a full inclusion program, it cannot implement PJ's IEP, which requires he spend 83% of the time outside of the general education classroom. As noted, the ALJ discounted the initial testimony of Ms. K. Davis, and expressly found her later testimony to be more persuasive and accurate.   This court will defer to the ALJ's credibility determinations.

With regard to Ms. K. Davis's later January 17, 2006, testimony, Plaintiffs argue that the "complicated machinations" she suggested still would not meet the requirements of PJ's IEP. Plaintiffs assert that the placement, as described by Ms. K. Davis, would not follow the written IEP because it would not provide for PJ to have lunch and recess with the general education students and because PJ would be mainstreamed for academic subjects part of the time and would receive his self-contained academics with a teacher and an aide, but only intermittently with other students. Plaintiffs argue that this violates PJ's IEP, which requires him to receive all academics in a small group setting.  Plaintiffs also assert that although the IEP provided that PJ was to receive all of his "specials" (e.g., art, music, physical education) in a small group setting, Ms. K. Davis testified that she would talk to PJ's parents and that "[H]opefully they would let him go to [general education] art and music" if accompanied by his one-on-one aide. (Paper 7, Tr. at 1373-74).  Plaintiffs contend that the IDEA also requires a student to be educated and participate with other

children with disabilities, in the least restrictive environment. They surmise that, at Forest Knolls, PJ would spend much time alone, as opposed to Ivymount where he spends the entire day with other students.

Ms. K. Davis testified at length regarding the OHP at Forest Knolls, and its ability to implement PJ's IEP.  First, she stated that the OHP was fully able to implement PJ's health plan, and that, based on Ms. Fulton's psychological report, PJ was appropriate for the OHP because "he would need the array of services that [the OHP would have] for him to meet the potential that is indicated by the report."  (Paper 7, Tr. at 1344).  Ms. K. Davis next reviewed the IEP's goals and stated that the overwhelming majority were typical of other students' goals within the OHP.[8]  More importantly, she testified that the goals could be implemented in the OHP.  Ms. K. Davis also testified that the IEP's supplementary aides and services, including test accommodations, were very typical and could be provided at Forest Knolls.

---

[8]   Ms. K. Davis stated that the reading, writing, math, advocacy, energy conservation, speech language communication, and occupational therapy goals all were highly typical of the other students within the program.  Two of the physical therapy goals were atypical - one regarding ascending and descending a short flight of stairs, and one regarding ascending and descending ramps - because Forest Knolls generally did not have either stairways or ramps.  Ms. K. Davis stated that neither goal was necessary because "the goals need to reflect what needs to happen in our setting to help [PJ] access the curriculum."  (Paper 7, Tr. at 1344-48).  To the extent that those goals remained in PJ's IEP, Ms. K. Davis testified that there are stairs in the physical therapy suite and that the school could either get a ramp or find an opportunity within the building where there is a ramp (e.g., curbside ramps).

Ms. K. Davis stated that Forest Knolls is able to provide speech and language services, occupational and physical therapy, vision services, and a full-time one-on-one aide for PJ, as set forth in the IEP. Ms. K. Davis also stated that the school has an ongoing relationship with InterACT, an organization that assists the school in determining what assistive technology a student needs. Ms. K. Davis testified that all of the doors at Forest Knolls are electronic to give the students access, and the hallways are ten feet wide and have railings to help with ambulation and balance stabilization. The school also has an occupational/ physical therapy suite and a large supply of wheelchairs and other equipment to assist those with physical disabilities. Ms. K. Davis stated that there are seven special educators in the building, each with her own resource room, which allows her to deliver the service in the most appropriate setting.[9] Moreover, the physical educators in the building provide both general-education physical education as well as adaptive physical education.

In the cafeteria, there is a separate table for those children who require special seating arrangements. Ms. K. Davis stated that it is not unusual for the staff at Forest Knolls to stagger the times the students go to the cafeteria in order to control the "traffic patterns." There are special education buses for transportation to and from school that are adapted to meet the needs of the particular student riders. Ms. K. Davis also commented on extracurricular activities, noting that PJ would have

---

[9] At the time of Ms. K. Davis's testimony, there were 15 students in the OHP at Forest Knolls.

the opportunity to become a patrol on the bus, or a member of the junior press corps.

When asked directly about whether the OHP could implement the IEP's requirement that PJ be educated outside of the general education setting 83% of the time, Ms. K. Davis responded affirmatively.  She described the intake procedure she would go through with the Lindners, which would include determining the details of what the program would look like at Forest Knolls.  She stated that, with the Lindners, she would have "fleshed out" PJ's day and talked about how to use PJ's one hour per day in the mainstream setting.

Ms. K. Davis then described her recommendations for implementing the 25 hours of special education and 5 hours of general education each week.  First, she proposed that the five hours of general education be used for academic purposes, placing PJ in the general education classroom for the essential learnings each day in reading, math, and language arts (i.e., 20 minutes for each area, over the course of the day).  Then, PJ would go, along with three other students, to the special education resource room "to have it re-taught, re-explained, adapted for his needs, and he would have a quiet space to work." (Paper 7, Tr. at 1362).  During the time in the general education classroom, there would be 23 students, the general education teacher, the special educator, PJ's one-on-one aide, and another special education instructional assistant who would be there to assist two other students (i.e., four adults to approximately 23 students).  In the resource room the ratio would be three adults to four students.

Ms. K. Davis stated that, based on the testimony at the hearing, it did not sound as if mainstreaming PJ during lunch and recess would be the best idea.[10] Accordingly, she proposed multiple ways that the OHP could provide a small group setting for PJ during those times. For physical education, Ms. K. Davis recommended providing PJ with adaptive services in a small group setting. She also proposed setting up PJ's day so that he would spend a half an hour at the beginning of the day in the special education room getting organized for the day and going over his daily activities with the special education teacher. At the end of the day, PJ would go back to the special education room where he could gather his belongings, and where the special education teacher could go over what happened during the day, and ensure PJ had all of his homework. PJ would leave to walk down to the bus slightly before the general dismissal, to avoid heavy traffic in the hallways.

Ms. K. Davis said that she would talk to PJ's parents and ask them how they wanted PJ provided with art and music instruction.[11] Although she stated that she hoped PJ's parents would allow him to receive the instruction in the general education setting along with the assistance of his one-on-one aide because it would be a safe

---

[10] The IEP called for PJ to spend lunch and recess in the general education environment, however Mr. Lindner testified that he did not believe that PJ could be "safely or appropriately educated" if he was in mainstream lunch and recess. (Paper 7, Tr. at 306). Dr. Conley testified that PJ should not be mainstreamed for recess because it has the highest demand for "physical coordination and agility and ability to demonstrate those kind of skills" and that PJ would not be able to socialize in that setting. *Id.* at 622-23.

[11] As noted, the IEP provided for special education instruction in those areas.

environment for him, she also noted the alternative possibility of providing those services to PJ separately in the special education room.  Finally, Ms. Davis recommended that approximately two hours of PJ's day would be spent in the special education room, where he would work on academics and long-term projects, and have the opportunity to work in small groups.

Ms. K. Davis testified that based on her proposed program, PJ reasonably would "have been expected to make meaningful educational progress through the implementation of his IEP goals and objectives through the schedule" that she described.  Moreover, she stated that PJ would have been provided with his education in the least restrictive environment.  (Paper 7, Tr. at 1378).

Both the ALJ and this court owe great deference to the decisions made by the MCPS educators, including their assertion that the OHP at Forest Knolls was capable of implementing PJ's IEP. *G ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 307 (4th Cir. 2003) (noting that the court ordinarily owes deference "to [the school's] simple assertion that it is capable of implementing the . . . IEP."); *MM*, 303 F.3d at 532-33.  The ALJ found and this court agrees that the OHP at Forest Knolls was capable of implementing the IEP.  The IEP calls for PJ to receive special education services 83% of the time, or 25 hours a week, with "small group instruction for the majority of his school day."[12]  (Paper 7,

---

[12] In their motion for summary judgment, Plaintiffs take issue with the fact that if PJ was not educated in general education for art and music, Ms. K. Davis's proposal results in PJ having that instruction alone (i.e., without other students).  Plaintiffs argue that the IEP *required* PJ to receive *small group instruction* in all
(continued...)

Lindner ex. 99).   Ms. K. Davis provided multiple ways in which these requirements could be met.   The fact that, based on the testimony she heard during the due process hearing, she may have suggested alternatives to structuring PJ's school day that were not explicitly provided for in the IEP (e.g., not mainstreaming PJ for lunch and recess, providing art and music in the general education classroom with a one-on-one aide), does not establish that the IEP could not be implemented as written.   (Paper 7, ALJ decision at 33).   Accordingly, Plaintiffs have not satisfied their burden of showing that MCPS denied PJ a FAPE.[13]

## IV.   Conclusion

For the foregoing reasons, summary judgment will be entered against Plaintiffs and in favor of Defendants.   A separate Order will follow.

                        /s/
                        _____
                        DEBORAH K. CHASANOW
                        United States District Judge

---

[12](...continued)
academics and in all "specials," and therefore, that Ms. K. Davis's proposal with regard to art and music does not satisfy the IEP. Nowhere in the IEP is it mandated that PJ receive small group instruction 100% of the time.   The IEP states that "PJ requires small group instruction for the *majority* of the school day" (paper 7, Lindner ex. 99, at Z), and indicates that PJ's "setting accommodations" would include *both* a small group setting as well as "individual administration within the school building."   *Id.* at U.

[13] Because the court finds that MCPS offered PJ a FAPE and will grant Defendants' motion for summary judgment, it need not address Defendants' argument that Plaintiffs' should be denied reimbursement for Ivymount because they failed to comply with the relevant IDEA procedural requirements.